UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

COASTAL COMMUNICATIONS SERVICE, INC.                :
and TELEBEAM TELECOMMUNICATIONS              :          DECISION AND ORDER
CORPORATION,                                                            :
                                                                                   :          02-CV-2300 (ENV)(SMG)
                                                Plaintiffs,          :
                                                                                   :
                        -against-                                       :
                                                                                   :
THE CITY OF NEW YORK, and NEW YORK           :
CITY DEPARTMENT OF INFORMATION               :
TECHNOLOGY AND TELECOMMUNCATIONS,  :
                                                                                   :
                                                Defendants.      :
------------------------------------------------------------- x

VITALIANO, D.J.

        In the 1978 film *Superman*, the renowned hero approaches a phone booth only to learn

that the local telephone company had switched from the full, private booths of the era in which

the comic book hero debuted to the more modern open kiosk—a style unsuited to his patented

wardrobe changes.  Not even Superman can roll back the tide of technology.  Today, the Court

confronts a number of aesthetically subtler but ultimately more critical changes within the

marketplace of public telephone service.  Plaintiffs Coastal Communications Service ("Coastal")

and Telebeam Telecommunications ("Telebeam"), operators of public pay telephone ("PPT")

services in the City of New York ("the City"), have moved for partial summary judgment on

their federal law claims relating to the City's regulations which affect public pay telephone

service.

        These claims spring from a new marketplace delimited by pancaked layers of lawmaking.

In the mid 1990s, legislation both on the national and local levels—most notably the 1996

Amendments to the federal Telecommunications Act of 1934 (the "TCA")—served to deregulate

the telecommunications industry, opening up telephone markets to competition where "the phone company" had reigned unchallenged for decades.  Plaintiffs' chief claim, brought pursuant to the TCA, is that the City, specifically the New York City Department of Information Technology and Telecommunications ("DoITT"),[1] systematically and unlawfully hampered plaintiffs' efforts to gain access to the market through a prolix and capricious process for (a) determining franchises and (b) approving PPT permit applications, fueled by unabashed favoritism of the incumbent service provider, now Verizon, and also as a result of various acts of retaliation against plaintiffs for their seeking redress in the legal system.

Deregulation may have come a day late and a dollar short.  A darker spectre was soon to haunt the fledgling PPT companies like Coastal and Telebeam.  As opportunities to provide PPT service opened up as a matter of law, PPT service itself plummeted in popularity as a matter of reality.  The emergence of mobile phone technologies gutted the demand for telephone booth service, forcing such companies to rely principally on revenue from advertisements placed on the sides of their booths.  Defendants stake their opposition to plaintiffs' motion and support their own cross-motion for judgment largely on the notion that this development removes plaintiffs' business from the ambit of the TCA.  Their essential argument is that telephone booth service is a figment of history, that the "market" in the City for PPT telecommunications services has hit a prolonged downturn with no foreseeable possibility of uplift, that plaintiffs' true business is in billboards rather than telecommunications and that the TCA is thus inapplicable.

Yet, the fact that the marketplace has withered does not warrant either its obituary or defendants' salient theme that Congress did not intend to regulate a withered market.  Neither caselaw nor legislative history supports such a narrow interpretation of Congress's intent in

---

[1] As a department of New York City, DoITT is *sui juris*.  All claims against it in this action are dismissed.  Ximines v. George Wingate High Sch., 516 F.3d 156, 160 (2d Cir. 2008).

enacting the TCA.  For the reasons that follow, plaintiffs' motion is granted in part and denied in part, as is the City's cross motion.

## **BACKGROUND**

I.      The Shifting PPT Industry

A brief overview of the PPT industry and its regulatory framework is offered for context. First, a note on the New York City marketplace.  PPTs in the City may be installed in one of three locations: (1) on private property—inside office buildings, for example, (2) on the building side of public sidewalks (called "on the building line", in industry parlance), or (3) on the curb side of sidewalks ("on the curb line").  DoITT (previously known as the Department of Telecommunications and Energy), currently requires, and at all relevant times required, a permit for the installation of sidewalk PPTs, which includes building line and curb line installations.

The prequel differs.  For decades, the laws of the City, like those of so many across the country, dictated that the only recipients of such permits for curb line PPTs would be the local, regulated monopoly telephone company.  In New York, it was the appropriately named the New York Telephone Company.  Antitrust concerns and corporate reorganizations brought a series of successors.  The incumbent successor is Verizon, which holds licenses for many but, it is undisputed, not all of the PPTs on City sidewalks. In the mid 1980s, other companies unaffiliated with the monopoly phone company's genealogy, known as "independent" phone companies at the time, began to install payphones on the building line with the permission of the adjoining property owner.  Dial tone service for such PPTs would be drawn from an existing telephone line to the building.  Apparently, the City did little for decades to police these unlicensed building line PPTs, and a fledgling independent industry developed against the exterior walls of New York's buildings.  No independent companies were licensed to run curb line PPTs.

In the mid 1990s, the landscape changed radically.  The New York City Council enacted Local Law 68 and adopted Resolution No. 439-A, subsequently amended by Resolution 2298, (together the "City PPT Law"), creating a system for the non-exclusive franchising, permitting and administration of sidewalk PPTs.  When the City PPT Law took effect in January 1996, DoITT acquired the authority to manage payphones <u>and</u> related enclosures that were installed, maintained or operated on the streets of the City at either the building or curb line.  Regulatory authority was exercised by requiring a permit and a franchise with the City that met certain conditions.  The City PPT Law gave the municipality wide discretion over payphone applications, and also required that DoITT notify the Department of Transportation and the Landmarks Preservation Commission, the former an executive agency of the City and the latter a quasi-independent one, of new PPT applications and offering them time to comment.

When the City PPT Law was enacted, the City estimated that there were some 35,000 PPTs installed and operating on New York City sidewalks.  Of these, Verizon operated 9,500, mostly at the curb line.  Chief among the remainder were independent PPTs that had been installed on the building line—unlicensed but unmolested by the City.

The City PPT Law brought dramatic change.  The curb line was essentially deregulated. No longer the exclusive domain of NYNEX, New York Telephone's progeny operating at the time, the City opened up the curb line to permit applications from independent companies, in part because it recognized the need to "promote competition in the public pay telephone industry."  Resolution No. 439-A.  By becoming subject to the same permit application process, the building line was, in essence, reined in.  Like curb line phones, building line phones, including those already in existence, would now be required to undergo a licensing process by the City.  Recognizing that the majority of PPTs in New York had operated for years without

licenses, the City established something of an amnesty program for them.  During an interim period between the enactment of the City PPT Law and the issuance of the new franchise agreements it required, existing independent payphones would be allowed to remain if  (1) they were registered with the City on or before March 31, 1996, (2) interim occupancy fees were paid to the City, and (3) their continued existence was not objected to by the Commissioner of DoITT.  These phones would be grandfathered into the regulated PPT system after the eventual issuance of a franchise to the independent company.

By May 1996, DoITT counted 32,679 registered PPTs owned by over 150 independent companies, including 1085 registered payphones of Telebeam and 79 of Coastal.  The sheer scope of such a revolutionary operation suggested that not everything would go smoothly, and, indeed, little did.  Somewhat predictably, independent companies launched a run on building line payphone locations in advance of and, defendants maintain, well after, the March 1996 deadline in an effort to get as many phones grandfathered as possible.  Defendants maintain that the rushed applications subject of this suit include many post-deadline, and others that would be incapable of being installed and operational prior to the amnesty deadline.  Defendants also represent that many of the applications from plaintiffs and other independent companies contained errors and omissions that prompted a correction period, during which Telebeam, among others, submitted several corrections and additional registry entries.

Advertising introduced yet another wrinkle in the complex inter-era transition in PPT management and oversight in New York City.  Although the phone booths of Clark Kent's comic book day, through the infancy of television and on to his 70's movie were not plastered with advertisements for radio stations, injury lawyers, pimple removers and the like, such adornments became an important part of the industry in the mid-1980s.  In 1988, the City granted what was

still New York Telephone a franchise to place advertising on its licensed PPTs on City sidewalks.  That agreement was renewed for another five years in 1993, subject to the execution of a new PPT franchise by New York Telephone.  Under the agreement, New York Telephone was required to pay 26% of its net commission to the City.  A holdover provision of the agreement allowed the company to continue to place advertising on its PPTs after the expiration of the franchise provided that the company continued to pay its commissions.  The agreement also disclaimed that the franchise it granted conveyed "any right or authority of the [New York Telephone Company] to install or maintain telephone booths on City sidewalks, and is subject to any limitation or revocation of such right."

The agreement was still in effect when the City PPT Law was enacted.  As a result, Verizon and its predecessors continued to carry advertising on the company's phones from 1996 onward.  Independent companies, now operating wholly within the City's regulatory framework but not yet blessed with franchise agreements, were kept from displaying advertising on their PPTs from 1996 until late 1999, when their franchises were approved.  Between 1996 and 1999, Verizon's predecessor paid the City $20.63 million in advertising commissions, a figure that suggests gross revenue from advertising of approximately $80 million during that period.

In October 2004, after accepting public comment, DoITT amended its rules concerning advertising on PPTs (the "2004 advertising amendment").  The 2004 advertising amendment prohibited advertising on PPTs installed after the effective date of the amendment in eight of the Borough of Manhattan's community districts.[2]  These eight districts comprise the area in Manhattan south of 110th Street on the West Side and south of 96th Street on the East Side.  Of

---

[2] The New York City Charter provides for the familiar division of the City into five boroughs, each now co-terminous with five New York State counties.  The Charter provides for a further subdivision of the boroughs into community service districts run by appointed boards of citizen volunteers.  Among other things, community boards ("CBs") provide operational and planning advice to borough and City officials and departments.

course, Verizon, pursuant to its prior agreements, had already penetrated these territories with PPT advertising.  At the time of passage of the 2004 advertising amendment, plaintiffs had more than 75% of the pending applications for PPTs in those eight community districts.

Plaintiffs point to the have and have not figures, among others, in describing the heavy cost they had to bear as a result of the City's pattern of unfair treatment.  They claim that DoITT wrongfully delayed and denied applications for permits for PPT locations, and wrongfully preferred Verizon and its predecessors in aspect after aspect of the transition to a post-City PPT Law world, coddling them with unique and favorable rules and punishing plaintiffs with retroactive rules that only further slanted the playing field in New York Telephone Company's successors' favor and in violation of the TCA.  Plaintiffs allege that once they challenged their unfair treatment, a round of retaliatory roadblocks befell them, all of which were exacerbated by repeated due process violations.

Defendants respond that their actions with regard to PPT management are not subject to the TCA, that any such claims are barred by *res judicata* anyway, and that their actions during the pendency of this action were reasonable, not retaliatory.  They further argue that the plaintiffs are not entitled to damages in this action under the TCA even if it does apply, and that a number of plaintiffs' claims brought pursuant to Article 78 of the New York Civil Practice Law and Rules lack a jurisdictional peg and should not be entertained by discretion if the Court determines it could exercise jurisdiction over them.

II.    Allegations of Retaliation

Contending the City's malfeasance went beyond simply coddling the incumbent phone company, plaintiffs argue that, starting in 1996, they communicated their concerns to DoITT only to incur the wrath of retaliation.  Specifically, they allege that, in response to DoITT's

"blanket" rejection of a number of plaintiffs' permit applications for PPTs in a particular community district, Robert Brill, plaintiffs' counsel, wrote letters to DoITT in December 2001 (the "Brill letters") to question the rejections, only to prompt a series of threats by DoITT officials intended to pressure plaintiffs into withdrawing the letter and foregoing suit.  John Sweeney, president of Coastal, avers further that he complained to Stanley Shor ("Shor"), assistant Commissioner of DoITT, on January 23, 2002 about DoITT's rejections.[3]  In that conversation, Shor, according to Sweeney, stated that DoITT wanted the Brill letters withdrawn because taking the time to explain the bases for the rejections would gum up the permit-reviewing machinery.  During the call, Shor also stated, Sweeney asserts, that any reason given would be a pretext in any event, for the true reason for the denial was powerful political opposition to the PPTs from the district's community board.  Finally, Shor allegedly informed Sweeney that Assistant Deputy Commissioner Agostino Cangemi had a message for plaintiffs: seek redress in court and they would see no more permits.  Cangemi's alleged threat was not only echoed to Sweeney but also to Raymond Mastroianni, Telebeam's CEO, by Carl Figiola, a public relations specialist retained by plaintiffs to communicate with DoITT officials.

Mastroianni also claims to have attended a meeting in February 2002 with DoITT officials where Cangemi allegedly stated that "if [Sweeney] thinks he is going to sue DoITT and the City, he will have another thing coming to him, and that if [Sweeney] sues he will never see another permit again."  (Mastroianni Rep. Decl. ¶ 34).  Mastronianni contends that Cangemi repeated these threats at several subsequent meetings as well, with Cangemi clearly intimating that he could manipulate DoITT rules and regulations to Telebeam's detriment.  Finally, Mastroianni alleges that, in June 2003, John Greeney, DoITT's Director of Enforcement,

---

[3] According to plaintiffs, the phone conversation between Shor and Sweeney was tape recorded, with copies of the tapes still in plaintiffs' possession and available for review.

8

informed him that the "marching orders" at DoITT (allegedly given by Cangemi and Shor) were to "come after" plaintiffs.  (Mastronianni Decl. ¶ 41; see also Pls. Ex. 45).  Greeney denies having made this statement.  (Defs. Ex. 167).  Shor, meanwhile, acknowledges that he asked plaintiffs to withdraw the Brill letters, but claims that he merely informed plaintiffs that it would be too time-consuming for DoITT to provide reasons for rejections of applications.  Cangemi, concurring in the alleged reason for the requested withdrawal of the Brill letters, categorically denied making any threats against plaintiffs.

Of course, plaintiffs, apparently undaunted by these threats, filed this action in April 2002.  At that point, plaintiffs contend, DoITT made good on its threats.  First, plaintiffs claim that there was a marked uptick in the number of permit rejections they received after the lawsuit. Coastal alleges that before the lawsuit, it had received 675 PPT permits and 1365 rejections related to permit applications filed before November 1998, while afterwards, the ratio shifted to only 25 permits received and 3557 rejections.  Telebeam claims that for permit applications filed before November 1998, it received 2000 pre-lawsuit application grants versus only 35 grants post-lawsuit.  The referenced rejections were done *en masse* and were largely attributed to DoITT's policy against "district saturation", a policy, plaintiffs say, that was spawned purely by this litigation.  DoITT insists that the significant number of rejections resulted from the agency's having deferred notification of previously rejected applications until a later date (coincidentally after filing of this lawsuit) in order to focus on processing pending permit applications and that it had announced this policy to the PPT industry, without objection, years before.

Additionally, plaintiffs allege that DoITT adopted harsh new rules after the filing of the lawsuit, all targeted at plaintiffs.  Chief among these allegedly retaliatory rules was the 2004 advertising amendment.  Plaintiffs attempt to tie the 2004 advertising amendment to their

retaliation claims by alleging that more than 75% of the permit applications pending at the time the amendment was passed belonged to either Coastal or Telebeam and an e-mail sent on January 13, 2004 by Fernando DeGuia Jr., Special Assistant to the Deputy Commissioner of DoITT, in which DeGuia Jr. wrote: "The legal team is anxious to start the CAPA process for the Rule change which includes the fees because its publication in the City Record will help the City in a lawsuit the ppt group is involved in."  (Pls. Ex. 61).

Finally, plaintiffs claim that after the Brill letters and the filing of this lawsuit, DoITT also stepped up intimidation in other ways.  Coastal claims that it did not receive a single notice of violation ("NOV") from DoITT before the filing of the lawsuit, but that a flood of NOVs followed filing.  DoITT counters that it ramped up enforcement generally in the PPT area around that time period and that after the lawsuit, plaintiffs' competitors (particularly Verizon) were issued more NOVs than plaintiffs.  Telebeam alleges a different sort of persecution, claiming that DoITT "instigated" audits of Telebeam, including by the New York City Comptroller's office.

III.    Procedural History

With the lawsuit bringing matters to a head, pre-answer, plaintiffs brought a motion for partial summary judgment on those claims relating to delays in processing over 7000 permit applications.  Judge Raymond J. Dearie referred the motion to Magistrate Judge Steven M. Gold. In a detailed and thoughtful opinion adopted almost entirely by Judge Dearie, Judge Gold denied the motion, ruling that because discovery had yet to yield much information about the relative viability of private property, building line and curb line PPTs, defendants' claim that plaintiffs were still able to compete meaningfully in the New York City PPT market (by virtue of their existing access to the PPT market) could not be meaningfully evaluated.  Defendants' cross motion was granted to the extent that certain due process claims were dismissed.

Judge Dearie later declined to exercise federal jurisdiction over plaintiffs' proposed state law claims concerning DoITT's 2004 rule changes prohibiting certain advertisements. With closure of the federal forum, plaintiffs commenced an Article 78 proceeding in state court (the "Article 78 proceeding").  There, plaintiffs advanced many of the same arguments they do here, including that some of the City's policies placed plaintiffs at a competitive disadvantage.  The state court rejected plaintiffs' Article 78 claims on July 5, 2006, but, despite the City's insistence, the court expressly declined to consider the plaintiffs' claims under the TCA. Meanwhile, discovery continued in this matter, leading to the instant cross motions for summary judgment.

## **DISCUSSION**

I.        Summary Judgment Guideposts

A motion for summary judgment is granted only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The Court's responsibility in assessing the merits of a summary judgment motion is thus not to try issues of fact, but rather to "determine whether *are* issues of fact to be tried." Sutera v. Schering Corp., 73 F.3d 13, 16 (2d Cir. 1995) (quoting Katz v. Goodyear Tire & Rubber Co., 737 F.2d 238, 244 (2d Cir. 1984)). In deciding such motions, the moving party bears the burden of demonstrating that there is no genuine issue as to any material fact, see, e.g., Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005), and the evidence presented will be construed liberally in favor of the party opposing the motion, see, e.g., Sec. Ins. Co. of Hartford v. Old Dominion Freight Line. Inc., 391 F.3d 77, 83 (2d Cir. 2004).  "If, as to the issue on which summary judgment is sought, there is

any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper."  Hetchkop v. Woodlawn at Grassmere, Inc., 116 F.3d 28, 33 (2d Cir. 1997).

If the moving party meets its initial burden of demonstrating the absence of a disputed issue of material fact, the burden shifts to the nonmoving party to present "specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The nonmoving party may not then rely solely on "conclusory allegations or unsubstantiated speculation" in order to defeat a motion for summary judgment.  Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).  Rather, the nonmoving party must "make a showing sufficient to establish the existence of [each] element to that party's case . . . since a complete failure of proof concerning an essential element of . . . [the] case necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 322-23.  If the evidence favoring the nonmoving party is "merely colorable . . . or is not significantly probative, summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

II.    Res Judicata & Collateral Estoppel

Before turning to the difficult terrain at the crossroads of the TCA and the City's PPT laws, the Court must initially decide what, if any, claims plaintiffs are entitled to advance.  The City argues that plaintiffs are barred from advancing their "federal claims", presumably meaning plaintiffs' TCA and federal constitutional claims, by the doctrines of *res judicata* and collateral estoppel.  Plaintiffs, of course, contest and contend that their federal claims are unencumbered by any previous state court judgment.

The City argues that there is a significant and, indeed, almost total overlap between the issues decided by the state court in the Article 78 proceeding and the claims advanced by plaintiffs now.  Thus, the City says, because New York adopts the transactional view of *res*

*judicata*, plaintiffs are barred from advancing their claims here.  Plaintiffs counter that the state court explicitly carved out their federal claims from its judgment and that, in any event, *res judicata* is inapplicable because the state court was not empowered to give the full relief available in federal court.

Traditionally, the doctrine of *res judicata* requires that "a valid, final judgment, rendered on the merits, constitutes an absolute bar to a subsequent action between the same parties, or those in privity with them, upon the same claim or demand."  Epperson v. Entertainment Express, Inc., 242 F.3d 100, 108 (2d Cir. 2001) (internal quotation omitted).  In measuring the applicability of the doctrine, "a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered."  Migra v. Warren City Sch. Dist., 465 U.S. 75, 76 (1984).  However, *res judicata* is, as plaintiffs say, inapplicable where the initial forum was not empowered to grant the full measure of relief available in the subsequent lawsuit.  See Burka v. New York City Transit Auth., 32 F.3d 654, 657 (2d Cir. 1994).

Here, neither plaintiffs' TCA nor constitutional claims are barred by *res judicata*.  As for the TCA claim, the state court explicitly declined to consider plaintiffs' claims under the TCA and left them to this Court to resolve.  Matter of Coastal Communication Serv., Inc. v. New York City Dept. of Info. Tech. & Telecom, 12 Misc. 3d 1179A, 824 N.Y.S.2d 761 (Sup. Ct., New York County, 2006) ("[T]his Court declines to consider [the TCA] issue here and defers to the federal court.") (hereinafter "Coastal I") aff'd 44 A.D.3d 309, 843 N.Y.S.2d 23 (1st Dep't 2007).  As a consequence, this Court will not give any *res judicata* effect to the Article 78 proceeding with respect to plaintiffs' TCA claim.  Cf. McLearn v. Cowen & Co., 60 N.Y.2d 686; 455 N.E.2d 1256; 468 N.Y.S.2d 461 (1983) (declining to preclude plaintiff from pursuing a state

claim previously brought in federal court where the federal court's judgment explicitly did not reach the state claim).  The same holds for the claims brought pursuant to 42 U.S.C. § 1983 for alleged violations of plaintiffs' constitutional rights.  Indeed, "[i]t is well settled that res judicata does not apply to bar a § 1983 action where a plaintiff has previously brought an Article 78 proceeding."  Hachamovitch v. Debuono, 159 F.3d 687, 695 (2d Cir. 1998).

But, there is more to issue preclusion than the doctrine of *res judicata*.  The City also argues that plaintiffs are collaterally estopped from re-litigating all of their TCA and constitutional claims because the Article 78 court necessarily and adversely decided issues common both to plaintiffs' federal and Article 78 claims.[4]  Although the Article 78 decision cuts more surgically through plaintiffs' claims than the broad swath the City asserts, by virtue of its collateral estoppel effects, plaintiffs are barred by the Article 78 decision from asserting the anti-competitive effect of DoITT's 2004 advertising amendment to establish their TCA claim.

When properly invoked, the doctrine of collateral estoppel bars a party from relitigating an issue decided against the party in a prior proceeding.  See Roe v. City of Waterbury, 542 F.3d 31, 41 (2d Cir. 2008).  As with *res judicata*, a federal court is required to give the same preclusive effect to a state court's treatment of an issue as the law of that state requires.  Jenkins v. City of New York, 478 F.3d 76, 85 (2d Cir. 2007).  In New York, there are two requirements to be satisfied for invocation of the doctrine: 1) "[t]here must be an identity of issue which has necessarily been decided in the prior action and is decisive of the present action" and 2) "there must have been a full and fair opportunity to contest the decision now said to be controlling." Buechel v. Bain, 97 N.Y.2d 295, 304; 740 N.Y.S.2d 252; 766 N.E.2d 914 (2001).

The thrust of plaintiffs' claims in the Article 78 proceeding was that the 2004 advertising

---

[4] Despite the City's tardiness in raising the collateral estoppel argument (discussed almost exclusively in its reply brief), the Court will consider the issue as a matter of judicial economy.  See Doe v. Pfrommer, 148 F.3d 73, 80 (2d Cir. 1998).

amendment was improper.  See Coastal I, 12 Misc. at1179A, 824 N.Y.S.2d at 761.  Plaintiffs

asserted several reasons in state court why the 2004 advertising amendment was improper—

among them was the plaintiffs' contention that the 2004 advertising amendment placed them at a

competitive disadvantage *vis a vis* Verizon in contravention of the City's own stated policy to

promote competition in the PPT industry.  (See, e.g., Defs. Exs. Vol. VI, Jacoby Aff. at ¶ 15).

Specifically, plaintiffs argued that because Verizon had been allowed to advertise for years

unmolested (and on illegal PPTs according to plaintiffs), the 2004 advertising amendment

impermissibly favored the "incumbent monopolist", Verizon.  (See Defs. Exs. Vol. VI,

Plaintiffs' Memorandum of Law at pg. 19-20; Jacoby Aff. at ¶ 19).  Thus, they argued, the 2004

advertising amendment was in direct conflict with other City pay phone resolutions that were

intended to promote competition in the PPT industry.  Moreover, plaintiffs asserted that the 2004

advertising amendment was passed with an "awareness" by DoITT that it would

disproportionately affect Coastal and Telebeam.  In support of their argument that the

amendment was anti-competitive, plaintiffs presented a full panoply of evidence to the Article 78

court, including discovery obtained in this action.  (See Defs. Exs. Vol. VI, Jacoby Aff. at ¶¶ 16-

23).

     The Article 78 court specifically rejected as a matter of fact plaintiffs' contention that

they were placed at a competitive disadvantage by the 2004 advertising amendment.  First off, it

noted that Verizon was subject to the same regulation, notwithstanding that it already had PPTs

with advertising located in the affected community districts.  See Coastal I at 12 Misc. at 1179A;

824 N.Y.S.2d at 761.  Furthermore, the court found, the 2004 advertising amendment did not

impinge on plaintiffs' ability to maintain advertising on PPTs they had installed prior to passage

of the amendment.  See id.  Moreover, the Article 78 court determined that the 2004 advertising

amendment was grounded in DoITT's rational concern over visual clutter, rejecting plaintiffs' argument that the 2004 advertising amendment was targeted at them.  See id.  Finally, the Article 78 court found that both plaintiffs and Verizon were still entitled to install new PPTs with advertising in community districts not affected by the 2004 advertising amendment.  See id. Therefore, the Article 78 court held that plaintiffs "ha[d] not demonstrated that [the 2004 advertising amendment] places petitioners at a competitive disadvantage in installing reliable public pay telephone service."  Id.

Plaintiffs are now barred from demanding another bite at the apple.  First, the identical issue front and center here was presented by plaintiffs in the Article 78 proceeding: the alleged anti-competitive effect of the 2004 advertising amendment.  In both cases, plaintiffs argue that the regulation's alleged anti-competitive effect was void as incompatible with legislation intended to promote competition in the PPT industry—in the Article 78 proceeding, it was the City's pay phone authorizing resolutions and here it is the TCA.  As far as plaintiffs' allegations concerning advertising and Verizon's competitive edge are concerned, litigation of the alleged anti-competitive effect of the 2004 advertising amendment was necessary to the Article 78 court's decision and the outcome of that litigation decisive for plaintiffs' advertising-themed TCA claims here.  See generally, TCG New York, Inc. v. City of White Plains, 305 F.3d 67, 76 (2d Cir. 2002) (hereinafter "TCG").  Plaintiffs were given, and of their own choice took, their full and fair opportunity to prove that the 2004 advertising amendment was anti-competitive. They failed to convince the Article 78 court of that fact.  That judgment is the final word on this argument.  Plaintiffs are, accordingly, now barred from again asserting the anti-competitive effect of the 2004 advertising amendment in this action.

III.     Other Claims Under the TCA

A.  *Background of the TCA*

The TCA became law on February 8, 1996.  Its stated purpose is "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies."  Pub.L. 104-104, 110 Stat. 56 (1996).   Among the tools Congress made available to hasten this wave of national telecommunications deregulation is § 253, a provision tellingly entitled, "Removal of Barriers to Entry."  Section 253 reads, in relevant part, as follows:

> (a) In general
> No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.
>
> (b) State regulatory authority
> Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this title, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.
>
> (c) State and local government authority
> Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.
>
> (d) Preemption
> If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

47 U.S.C. § 253.   Giving effect to the marketplace-altering effect of § 253, the Second Circuit has adopted the evaluative mechanism used by the Federal Communications Commission (the "FCC") in determining whether a local regulation violates the TCA, holding that a court properly

17

"consider[s] whether the ordinance materially inhibits or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment." TCG, 305 F.3d at 76 (citing California Payphone Ass'n, 12 F.C.C.R. 14191, 1997 WL 400726 (F.C.C. 1997) at ¶ 31).

Plaintiffs claim that defendants violated § 253 by imposing regulatory requirements that limited the ability of independent PPT service providers to compete in a fair and open telecommunications market through undue delays, the exercise of unfettered discretion and negligent treatment.  In opposition, the City raises a number of threshold challenges.

B.  Availability of Damages Under 42 U.S.C. § 1983 for TCA Violations[5]

The City first asserts that the TCA does not authorize monetary damages.  Coastal and Telebeam each seek compensatory damages of no less than $25 million, in addition to several forms of declaratory and injunctive relief.  Relying heavily on then-United States Magistrate Judge Kiyo Matsumoto's Report and Recommendation in New Phone v. New York City Dep't of Information Technology and Telecommunications, slip op., 03-cv-3978 (E.D.N.Y. August 25, 2006), the City argues that entities adversely affected by non-compliance with § 253 of the TCA have not been deprived of "rights" such that could be vindicated by § 1983.

During the Court's consideration of the instant motions, the Second Circuit ruled definitively that § 253 does not create a private right of action for damages that can be vindicated through a § 1983 action.  NextG Networks of NY, Inc. v. City of New York, 513 F.3d 49, 52-53 (2d Cir. 2008).  The Court, therefore, grants summary judgment in favor of the City with respect to plaintiffs' money damage claims under § 253.  Only declaratory and injunctive relief remain.

---

[5] There is no private right of action for damages expressly created by § 253.

C.  *Applicability of Section 253  to the City's Actions:  Nature of Conduct Pre-empted*

The City's second line of attack is not as potent.  It argues that plaintiffs' claims under §

253 must fail because the market lacks sufficient demand to support the PPT business on its own.

Positing that the TCA only protects entities like Coastal and Telebeam from government actors

who "prohibit or have the effect of prohibiting the ability of any entity to provide"

telecommunications services, the City reasons, those instances in which no entity would be able

to provide self-sustaining telecommunications business – such as those in which insufficient

demand exists for PPTs to profit – would fall beyond the scope of the Act.

To be sure, at least one component of defendants' argument appears true beyond dispute

given the dense factual record before the Court:  in the absence of advertising or some other

complementary source of revenue, providing PPT service in the subject New York City

community districts is, at least now, a floundering enterprise.  Plaintiffs and defendants both

embrace the reality that payphones – at least at the curb line market the plaintiffs seek to enter—

cannot be installed or maintained based on payphone revenue alone.  Both sides admit, in fact

argue affirmatively, that advertising money is crucial to the provision of PPT services.  Plaintiffs

cling to this claim in conjunction with their allegations that they were denied access to lucrative

advertising areas of the City and that their ability to run advertisements on their phone

installations was unfairly delayed.  (See, e.g., Mastroianni Decl. ¶ 43, Kravtin Report at 63

(representing that independent PPT franchises need advertising revenue and cannot be installed

without it)).  Defendants toe the same line but for a different reason, arguing, in effect, that

Telebeam and Coastal are in the advertising billboard business rather than the

telecommunications business because no self-supporting market exists for sidewalk PPTs.

Without some showing that the free market would support provision of the service, they contend,

any alleged "prohibition" is theoretical at best and grossly miscategorized at worst.

The Court certainly agrees that the TCA does not exist to open up the billboard market to competition.  Whether this portrayal accurately characterizes the TCA's applicability to the PPT industry in New York City is another question altogether.  Section 253(a) mandates that no state or local law or requirement "may prohibit or have the effect of prohibiting the ability of any entity to *provide* any interstate or intrastate telecommunications service."  (emphasis added).  The relevant clause does not refer to ultimate viability of the targeted telecommunications market, or the success of individual participants in that market.  Section 253(a) concerns itself solely with the provision of service, not whether the putative service can survive economically.

Similarly, as defendants themselves note in their memorandum, the term "telecommunications service" is defined by the TCA as the "*offering* of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used."  47 U.S.C. § 153(46).  As far as the Court can divine, neither the legislative history of the TCA nor any construing case  law incorporates a particular market vision that necessitates denying § 253 protection to those would-be providers of telecommunications who have not proven the success of their business models in advance.

The TCA should not be confused with legislation such as the Sherman Act or other antitrust laws, which, because they require an "antitrust injury", or injury to the relevant market, necessitate a review of the viability of the market.  See Mathias v. Daily News, L.P., 152 F. Supp. 2d 465, 480 (S.D.N.Y. 2001) (Sherman Act plaintiff must show "viable and relevant market"); see also, George Haug Co. v. Rolls Royce Motor Cars Inc., 148 F.3d 136, 139 (2d Cir.1998) (internal citation omitted) (threshold requirement for a private plaintiff under §§ 1 or 2 of the Sherman Act is showing that the challenged action has had an actual adverse effect on

competition in the relevant market).  In such cases, the absence of any real market for a product

or service may foreclose a claim.  However, the Second Circuit has not countenanced this

requirement in considering the validity of a municipal regulation under the TCA, focusing

instead on the impact of the regulation on a competitor's ability to offer telecommunications

service.  See, e.g., TCG, 305 F.3d at 76-77.  That is the relevant inquiry.

Defendants challenge even this point, attempting to group plaintiffs' claims with those of

the plaintiffs in Underground Construction Co. v. City and County of San Francisco, 2002 WL

1585628 (N.D. Cal., July 15, 2002).  In that case, a construction company that installed conduits

for telecommunications services was found to lack standing to assert a claim under the TCA as a

company attempting to provide telecommunications service.  But, the distinction between that

case and this is obvious: unlike a company that merely creates the tunnels through which

telecommunications wiring is snaked, plaintiffs clearly provide actual telecommunications

service by installing and maintaining public pay telephones themselves.  Despite the presence of

advertising on the sides of these public phones kiosks and its important place in the business

model of PPT companies, the Court finds that plaintiffs do provide covered services.  The

"offer" of telecommunications service may be intertwined with the business of advertising

billboards even to a great degree, but the provision of PPT service is a telecommunications

service nonetheless.  The presence of advertising on the sides of phone booths does not divest

plaintiffs of their status as providers of telecommunications services any more than the presence

of ads atop taxicabs alters their status as a livery or signs on the sides of buses alter theirs as a

common carrier.  If would-be telecommunications providers are, by definition, "*offering* []

telecommunications for a fee directly to the public," then they share in the protections afforded

by the TCA.  PPTs inarguably belong to that class of entities, even if their efforts to do so at a

21

profit are met with increasingly little success.  In point of fact, the TCA has repeatedly been applied to entrants into the PPT market without any preliminary discussion of whether the PPTs are, or have the slightest potential to be, financially successful purely from PPT profit.  See, e.g., New Jersey Payphone Ass'n, Inc. v. Town of West New York, 299 F.3d 235 (3d Cir. 2002); Global Network Communications, Inc. v. City of New York, 507 F.Supp.2d 365 (S.D.N.Y. 2007); see also In the Matter of New England Public Communications Council Petition for Preemption Pursuant to Section 253, 11 FCC Rcd. 19713, 19720 (Dec. 10, 1996).

Because plaintiffs are providers of telecommunications services, the TCA protects them from those state or local rules, laws, regulations or requirements that have the effect of prohibiting them from providing such services – period.  This is without regard to whatever speculation may exist as to their ultimate success or failure in the marketplace.  It necessarily follows that defendants' argument that plaintiffs have failed to provide "dollars and cents" proof that demand for PPT service exists also fails.  This artificial burden advanced by the City finds no basis in law. The naked reality is that plaintiffs, as the party seeking preemption, need only prove that their ability to provide service is being limited impermissibly and need not be able to demonstrate to an investor that, absent such illegal restrictions, their plan would also make good business sense.

D.      Applicability of Section 253  to Defendants' Actions:  Municipal Decision Making With Respect to Payphones

Defendants argue in addition that § 253(a) is categorically inapplicable to municipal decisionmaking with respect to sidewalk PPTs.  Under this approach to TCA preemption, the City as a property manager and guardian of the public interest has absolute operational authority over how services are delivered in its public spaces.  In this capacity, so the argument goes, the municipality acts as the acquirer of services and facilities to be provided at publically owned and

22

managed locations, and not as a market gatekeeper.

This tortured route away from § 253 preemption ends in a blind alley.  It is true that "the Telecommunications Act does not preempt nonregulatory decisions of a local government entity or instrumentality acting in its proprietary capacity ...."  Sprint Spectrum L.P. v. Mills, 283 F.3d 404, 421 (2d Cir.2002).  Placing a local government's actions in either a proprietary or regulatory category involves determining whether the municipality's "'interactions with the market [are] so narrowly focused, and so in keeping with the ordinary behavior of private parties, that a regulatory impulse can be safely ruled out.'"  This in turn prompts pondering "(1) whether 'the challenged action essentially reflects the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances,' and (2) whether 'the narrow scope of the challenged action defeats an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem.'"  Id. at 420-21 (internal quotation omitted).   In this case, the scope of the City PPT laws is sufficiently broad as to preserve the regulatory inference.

Defendants rely upon, and heavily strain, the FCC's determination in the case of In the Matter of Amigo.net, 17 FCC Rcd 10964 (June 13, 2002). In Amigo.net, the FCC found that the state of Colorado's contract with Qwest Communications to construct a statewide network capable of providing high-speed telecommunications services and provide such services to agencies of the state government did not run afoul of the TCA.  The FCC, specifically evaluating "the contract's effect on the provision of telecommunications service, that is, whether the contract imposes a requirement that has the effect of prohibiting the provision of any telecommunications service," was "merely acquiring fiber optic capacity for its own use" as opposed to "granting its contract partner exclusive access to freeway rights-of-way, which other

carriers would need in order to provide fiber optic services." Amigo.net, 17 FCC Rcd at 10967. Although the contract could have the effect of impermissibly prohibiting service if it impeded the ability of providers to enter the market, the FCC found that that was not the case.

It is true that the opinions of the FCC should be accorded a certain level of consideration when it comes to determining the applicability of § 253. See TCG, 305 F.3d at 76. However, at no point did the FCC announce the sweeping holding that defendants conjure in support of their motion. The City claims that Amigo.net stands for the universal proposition that a state entity's responsibility for the selection of services absolves it of any obligation to follow the TCA. Stated differently, the City submits that because Colorado was responsible for the selection of telecommunications services and it was found not to be subject to preemption under § 253(a), no state entity with similar responsibilities can be so burdened.

Unfortunately for the City, this was not the actual holding in Amigo.net. Much more simply, the FCC determined whether Colorado's actions had the effect of prohibiting entry into the market, and concluded that they did not. This exemplifies the test applicable to any state actor under the TCA.[6] The state of Colorado passed that test in Amigo.net. The City, if it is found that it (through DoITT) systematically prevented Coastal, Telebeam and other non-dominant companies from entering the sidewalk PPT market, may not. To rule otherwise based solely on the City's responsibilities as a facilitator of services would undermine the purpose of § 253, which is, if nothing else, to augment those responsibilities so as to obligate state actors not to block free-market entry into the telecommunications field when they are facilitating the

---

[6] Defendants' use of Nixon v. Missouri Municipal League, 541 U.S. 125 (2004), falls flat in a similar way. In that case, the Supreme Court merely held that § 253 does not preempt state actors from barring their own political subdivisions from providing telecommunications services, a circumstance that does not apply here.

provision of such services.  The City's argument is meritless. [7]

###### E.  The Availability of Reasonable Alternatives to the Sidewalk PPT Market

Under § 253(a), "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunication service."  47 U.S.C. § 253(a).  Courts, including the Second Circuit, have found that the prohibition does not have to be complete or "insurmountable" in order to violate the statute.  TCG, 305 F.3d at 76.  Rather, the operative test is whether the legal requirement in question "materially inhibits or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment."  Id. (citations omitted).  The City, dating back to plaintiffs' initial motion for partial summary judgment on the issue of permit delays, has argued that those locations not covered by the Local Law 68 process – that is, those locations other than on City sidewalks -- offer a meaningful alternative to curb and building line service.  Because it is still possible for plaintiffs and companies like them to construct indoor booths, defendants argue, there is still an entry into the marketplace.  Not surprisingly, plaintiffs argued that the relevant market at issue here is the market for outdoor PPTs, but that even if the relevant market is the total New York City PPT market, the City's alleged failure to process permits and resulting denial of access to every segment of that market except for indoor PPTs does not allow Coastal and Telebeam an opportunity to compete meaningfully in the market as a whole.  In advancing this argument, plaintiffs relied substantially on the Third Circuit's decision in New Jersey Payphone Ass'n v.

---

[7] Defendants suggest that Florida Public Telecommunications Assn. v. City of Miami Beach, 2001 U.S. Dist. LEXIS 26706 (S.D. Fla. Aug. 17, 2001), aff'd in part and rev'd in part, 321 F.3d 1046 (11th Cir. 2003) further supports its argument.  Simply put, it does not.  In that case, the district court merely undertook the same decisionmaking facing this Court—whether a regulation concerned telecommunications or the public rights-of-way.  It concluded that some of Miami Beach's regulations touched on the public rights-of-way and thus were not pre-empted.  Id. at *33-38.  Florida Public does not hold that any municipal action dealing with some combination of pavement, concrete and asphalt is shielded from TCA scrutiny.

<u>Town of West New York</u>, 299 F.3d 235 (3rd Cir. 2002).  In that case, the ordinance at issue gave

the town of West New York the right to grant exclusive PPT franchises to one or two providers.

The Third Circuit specifically rejected the town's argument that other carriers still had the right

to operate PPTs on private property:

> As to placing pay telephones on private property, the Town provides no evidence for the
> inherently implausible proposition that such installations would allow other providers to
> fully compete for the patronage of people requiring use of a payphone while travelling
> or otherwise located in public places. In economic parlance, payphones on private
> property would, for various reasons such as the inconvenience of traveling to such
> phones or their lack of visibility from the rights of way, be imperfect substitutes for
> phones actually in the rights of way. The availability of competition from such locations
> thus does not save the Ordinance from the prohibitions of Section 253(a).

299 F.3d at 242.  Noting the absence of any reference to factual support for this conclusion in

either the Third Circuit or lower court opinions, the possible variance between the market

environment in a relatively small municipality such as West New York and that of a large

metropolis like New York City, all coupled with the undeveloped factual record at such an early

stage in this case, Judge Gold recommended that the motion for summary judgment be denied.

Now, with discovery in the case having since taken place, and with the factual dispute over the

relative economic viability of building-line, curb-line and indoor PPTs having been fleshed out

with facts, the Court turns to this question anew.

The inquiry begins with Judge Gold's challenge to plaintiffs to present evidence that the

locations not subject to Local Law 68 do not offer a "meaningful, fair and balanced alternative"

opportunity to provide payphone service.  Discovery has yielded a number of facts through

which the Court finds plaintiffs have met that challenge.  First and foremost, the Court has been

provided with statements from high level DoITT personnel that curbside and building line PPTs

comprise different markets (Allison Dep. at 45) and that curb and building line phones

essentially represent "different sub-industries" (Comp. Exh. 64).  The City's own policies treat

curb and building line franchises in disparate fashion, categorically assigning the curbside PPTs and building line PPTs different fees.  One aspect of the disparateness is particularly compelling: that one competitor may only be able to provide service in limited circumstances and under an alternate fee schedule while the other has access to a choice between curb side franchising (for a percentage of gross revenue) and building line franchising (at a flat fee) strongly suggests an unbalanced market environment for PPT services.  The City offers no factual rebuttal.

In the case of indoor versus outdoor telephone PPTs, the Court finds, therefore, that, supported by differing market reactions, an unbalanced regulatory environment exists in the City's PPT marketplace, despite some of plaintiffs' more dubious and unnecessary factual presentations to that end.  Specifically, plaintiffs' expert report features a survey in which people are asked about their payphone location preferences; the inquiry posed was leading in a way that would render it useless.[8]  Similarly, defendants' context-blind inquiry as to whether survey respondents "wanted to use a payphone" assumes a choice that potential customers walking down a street may not know they have (indoor payphones present issues of outdoor visibility).  This methodological flaw, however, hints at the rationale behind the Third Circuit's decision in West New York, and why this Court is similarly inclined to find an imbalance in the legal and regulatory environment even where an indoor alternative actually exists.  Put simply, the decisive aspect of plaintiffs' otherwise lacking demonstration is that the indoor alternative is, in fact, indoors.

The Court cannot fathom a legal and regulatory environment for PPT services free of inhibitions or limitations on market participation in which certain market entrants can place their PPTs in outdoor view and others are restricted to putting their pay phones indoors.  As the Third

---

[8] Survey participants were asked, outdoors and in the month of June, to look around and state where they would prefer to go "at this moment" if they needed to use a payphone.  It is a query that skews results away from indoor locations in obvious ways.

Circuit noted, once the bare fact of a restriction on outdoor placement to one competitor has been established, the notion of fair competition between that competitor and a competitor whose domain includes the visible and continuously accessible sidewalks of the locality is inherently implausible.  Private property, set off from the sidewalks by a variety of legal impediments (the public's infrequent right of access chief among them) and, more obviously, physical obstacles (*i.e.*, walls, doors and stairs), cannot be said to be a placement that offers a meaningful alternative to the outdoor market.  Defendants' showings that curbside and indoor PPTs have both been losing propositions recently as viewed through the lens of monthly phone service revenue miss the point.  Courts have ruled that a prohibition need not be absolute or insurmountable in order to run afoul of § 253.  The question is not one of results, but of the balance in the regulatory scheme.  Unless the market consists of potential PPT customers with Superman's X-ray vision, the lack of restrictions on the indoor market does not level the public phone playing field in compliance with § 253 as a matter of law.

### F.  Applicability of Section 253(a): The Section 253(c) Safe Harbor

As a final threshold TCA argument, defendants assert that § 253(a) does not apply to them because their actions are protected under § 253(c), which reads as follows:

> (c) State and local government authority
> Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

47 U.S.C. § 253(c).  Defendants contend that this provision establishes a safe harbor for any action concerning the "management of the public rights of way" and that each of the challenged laws and requirements fall within the scope of this protection.

Many courts have relied upon the FCC's interpretation of this safe harbor provision,

including the lower court in <u>TCG</u>.  <u>See</u> <u>TCG New York v. City of White Plains</u>, 125 F.Supp.2d

81, 90 (collecting cases) (hereinafter "<u>TCG New York</u>").  The <u>TCG</u> district court recounted the

FCC's liberal citation of the Congressional Record in outlining the realm of regulations Congress

intended to preserve within the safe harbor.  Among these are regulations that allow local

governments:

> …to perform the range of vital tasks necessary to preserve the physical integrity of streets
> and highways, to control the orderly flow of vehicles and pedestrians, to manage gas,
> water cable (both electric and cable television), and telephone facilities that crisscross the
> streets and public rights-of-way.... [T]ypes of activities that fall within the sphere of
> appropriate rights-of-way management ... include coordination of construction schedules,
> determination of insurance, bonding and indemnity requirements, establishment and
> enforcement of building codes, and keeping track of the various systems using the rights-
> of-way to prevent interference between them.

<u>TCG New York</u>, 125 F.Supp.2d at 90 (internal citation omitted).  The Second Circuit did not

disturb this finding, affirming the notion that there is differing statutory treatment of regulations

that are relevant "only for regulating telecommunications, which s 253 does not permit [the city]

to do" and "for regulating use of the rights-of-way, which [the city] may do."  <u>TCG</u>, 305 F.3d at

81.  Those regulations are to be read narrowly, and TCA compliance demands that they include

only elements necessary for maintenance of the rights-of-way.  <u>TCG New York</u>, 125 F.Supp.2d

at 92, <u>see</u> <u>also</u> <u>TC Systems, Inc. v. Town of Colonie, New York</u>, 263 F.Supp.2d 471, 486

(N.D.N.Y. 2003).  In short, hiding forays into actual telecommunications regulation under the

guise of rights-of-way regulation is clearly unacceptable under the TCA.

    Defendants argue that, unlike in other transmission line cases, PPT management should

automatically be considered within the scope of managing of rights-of-way by virtue of the fact

that PPTs physically exist on a municipality's rights of way, creating a blanket warrant for cities

to assess the public need for PPT service at any given location.  The Court disagrees.   The

standard created by the cases in this circuit draws a meaningful distinction between, say, a city

government's determination that a potential PPT installation threatens the integrity of the roadbed and, to use the example provided by defendants in their brief, its decision that in a time of increased cellular phone use, PPT supply should be contracted by regulation to match decreased PPT demand.  The former is protected by the safe harbor as clearly relevant to the control of rights of way.  The latter, focused on considerations of consumer demand, is not.  See generally TCG, 305 F.3d at 81; see also Tel Comm. Tech. v. City of New Haven, 2006 U.S. Dist. LEXIS 60440, *14-15 (D. Conn. Aug. 10, 2006).  Plainly, § 253(c) does not act as a broad aegis, shielding any municipal policy-making that tangentially touches on right-of-way issues.  Rather, the operative question becomes whether each of the alleged local regulatory incursions fits into the § 253(c) rubric.

   *G.  Plaintiffs' Allegations of Impermissible DoITT Policies and Practices Under the TCA*

   Plaintiffs attack a number of policies allegedly adopted by the City precisely as the type of competitive bar in the telecommunications industry that Congress sought to avoid through passage of the TCA.  The corresponding TCA analysis requires a two-step process: first, a court must determine whether each challenged municipal policy runs afoul of § 253(a) and, second, it must determine whether § 253(c) saves the regulation.  See e.g., Qwest Communs. Corp. v. City of New York, 387 F. Supp. 2d 191, 193 (E.D.N.Y. 2005).

   **(i)      "Best Interest of the City"**

   The first, and most broadly sweeping, of these policies is the unfettered discretion granted the Commissioner of DoITT with respect to PPT permit issuance.  Local law empowers the Commissioner of DoITT to issue permits at his or her discretion in the "best interests of the City."  New York Administrative Code § 23-403(a); (see also Shor December 2002 Aff, ¶¶10-11; Cangemi 2/9/2005 Tr. at 25).  Although obviously incapable of precise definition, the "best

interests" inquiry appears to be a broad one, requiring the Commissioner to "take into consideration the various interests of all the people in the city and make an evaluation as to what would be protecting the interests of the citizens and the people who use the streets." (July 30, 2004 Shor Tr. at 36:15-23). When permits were rejected, applicants were offered the opportunity to show that an "unusual level of public interest" existed with respect to the specific locations under consideration. (Shor Aff. ¶¶ 108-114, Exhs. D53, D54).

Such categorically broad discretion has been roundly rejected in the telecommunications context. In TCG, the Second Circuit considered an ordinance enacted by the City of White Plains, New York that allowed its Common Council to reject any application to provide telecommunications service based on "'any public interest factors…that are deemed pertinent to [White Plains].'" 305 F.3d at 76. The court determined this provision of the ordinance was pre-empted by § 253(a) because it "amount[ed] to a right to prohibit providing telecommunications services." Id.; see also Qwest, 387 F. Supp. 2d at 193. The same is true here. Under the City's challenged regulatory structure, the Commissioner enjoys unchecked authority to reject PPT applications (and thus hinder competition) for any reason he determines to be in the City's best interest, including reasons beyond those appropriately linked to management of the right-of-ways. Quite simply, § 253(a) does not allow for such a broad municipal grant of authority with respect to the PPT industry. See TCG, 305 F.3d at 76.

**(ii)** **"District Saturation"**

One of the factors incorporated into the "best interest" inquiry relates to DoITT's policy of "district saturation," a policy plaintiffs contend was a product of this litigation. More critically, they contend, it was the factor which lead to denial of thousands of PPT permit applications in certain Manhattan CBs. The underlying principle for district saturation was

31

simple (and commonly applied in CB location decisions involving various unwanted public services): some districts believed they had too many PPTs to be useful.  In order to "measure" district saturation, DoITT considered several subfactors, including (1) average number of PPTs per block, (2) increased citywide cell phone usage, (3) penetration of home telephone service and (4) opposition from CBs to more PPTs.  (See Shor Aff. ¶¶ 108-114; see e.g., Pls. Exs. 68 & 69).  Of course, this calculation included Verizon phones, which given the head start of New York Telephone and its progeny before enactment of the TCA and Local Law 68, had already proliferated into these heavily trafficked districts.  And, importantly, as the City readily acknowledges, there is no dispute that district saturation was the guiding principle for the denial of thousands of PPT permit applications.

What is troubling, to be sure, is that the key to the City's district saturation analysis is a determination of how many public phones on a block DoITT concludes is too many.  The problem is that Congress has already determined it is the market, not the municipality, that is to determine consumer demand for PPTs, and an attempt by a municipality to regulate the PPT market based on its own (dim or otherwise) view of that market's prospects fits squarely within the TCA's reach.  See pg. 19-23, supra.

A local rule that butts heads with § 253(a) is not doomed, to say the least.  It can be salvaged by the safe harbor provision of § 253(c).  However, district saturation, by the City's own definition, includes a market-vision of the PPT industry in a select community board district.  This sort of regulation is palpably different from the sorts of regulations considered protected by § 253(c).  See pg. 29, supra.  To put it more bluntly, defining and maintaining the "appropriate" market share or size of the PPT industry in a given geographical market is a telecommunications regulation not a right-of-way regulation.  See generally TCG New York,

125 F.Supp.2d at 90 (internal citation omitted).  Thus, district saturation is not saved by § 253(c).[9]

### (iii)     Political Pressure

Apart from district saturation, plaintiffs also allege that DoITT either rejected or indefinitely placed on hold thousands of permit applications due to political pressure from local community boards, business improvement districts ("BIDs") and, at certain junctures, indirect pressure from then-Mayor Rudolph Giuliani.  Local Law 68 requires that DoITT give the CBs notice of new applications and time to comment on them, but does not (and under the TCA could not) explicitly provide a "not in my backyard veto".  However, plaintiffs contend that, nonetheless, PPT permit applications were rejected or held based on heavy opposition from the CBs, who were empowered by Mayor Giuliani to play a decisive role in any PPT permit application.  It is an argument the Court finds bizarre—that the TCA was violated separately by constituent groups successfully exercising their First Amendment rights to lobby government to limit PPT installations.  At best, the argument adds nothing.

As to the substance of the argument, not surprisingly, plaintiffs have succeeded in proving the obvious:  the affected community boards did precisely what the New York City Charter expects them to do, *i.e.*, to advise DoITT officials of the service and planning issues in their districts.  Put differently, and the problem for plaintiffs, however, is that none of these groups, be they community boards, BIDS, or even political cronies, had the actual power to deny a single PPT permit application; all that they had was the ear of DoITT (as intended by

---

[9] To be clear, the Court does not hold that the saturation of PPTs in a district could never constitute a right-of-way issue, redressable by the City in harmony with the TCA.  Thus, for example, the City could conclude that the prevalence of PPTs on a particular city block compromises the structural integrity of the sidewalk, impacts gas or water mains under the sidewalk, or hinders safe passage of pedestrians and passengers alighting from vehicles.  However, by DoITT's own admission, its district saturation policy was motivated, in principal part, by the allegedly sated demand for PPTs in the affected districts.

municipal design).  The TCA's reach is not so broad as to ban, by creating liability for it,

communication between a municipality and its citizens over matters of communal concern.  Cf.

United States Term Limits v. Thornton, 514 U.S. 779, 838 (1995) (Kennedy, J. concurring) (The

Constitution established "two orders of government, each with its own direct relationship, its

own privity, its own set of mutual rights and obligations to the people who sustain it and are

governed by it.").  Stated more simply, for purposes of the TCA, it is not who gave DoITT the

idea that, for example, a particular district had sated PPT demand that matters, but rather that

DoITT acted on that idea.  Thus, all the sound and fury plaintiffs associate with the "political

pressure" placed on DoITT does no more than prove the already established conclusion—DoITT

violated the TCA by impermissibly regulating the PPT industry based on notions about

consumer demand.  It does not establish an independent TCA violation.

### (iv)  2004 Advertising Amendment

Plaintiffs' claims with respect to the 2004 advertising amendment are hemmed in on all

sides by the decision of the Article 78 court.  Plaintiffs hinge their entire TCA argument with

respect to the 2004 advertising amendment on the amendment's allegedly anti-competitive

effect, a factual claim, as noted above, the Article 78 court has already rejected.  Thus, plaintiffs'

claim is cut off at the knees.  Plaintiffs' TCA claims concerning the 2004 advertising amendment

are dismissed.

### (v)  DoITT's Alleged Favoring of Verizon

In addition to the alleged obstacles DoITT placed in plaintiffs' path, there was also the

alleged favoritism shown by DoITT to Verizon and its corporate predecessors.  By looking the

other way at times, and at other times actively participating, DoITT, plaintiffs argue, aided the

incumbent phone company in subverting Local Law 68 and other DoITT regulations.  Although

the City challenges that assertion substantively, it first throws up a jurisdictional barrier for

plaintiffs to surmount—the failure to join Verizon as a necessary party pursuant to Fed. R. Civ.

P. 19.[10]

The first step in a Rule 19 analysis is to determine whether the absent party is

"necessary".  Conntech Dev. Co. v. Univ. of Connecticut Educ. Prop., 102 F.3d 677, 681 (2d Cir.

1996).  Because Verizon has not claimed an interest in this litigation, the only way it could be a

necessary party is if complete relief cannot be accorded plaintiffs in Verizon's absence.  Fed. R.

Civ. P. 19(a).  Here, plaintiffs essentially argue that DoITT has conspired with Verizon to allow

Verizon to flout both Local Law 68 and DoITT regulations through:

> • DoITT's creation of unique processes and rules to grandfather in unlicensed
> Verizon PPTs in contravention of Local Law 68;
> • DoITT's allowing Verizon to advertise on these "illegal" PPTs from 1996 to 1999
> while plaintiffs' franchises (and thus permission to advertise) languished;
> • DoITT's failure to enforce Local Law 68 against Verizon for its failure to
> properly register its PPTs;
> • DoITT's exempting Verizon from payment of interim registration fees for its
> "illegal" PPTs[11]; and
> • DoITT's allowing Verizon to maintain its pre-existing PPTs in violation of
> DoITT's siting rules and other geographic regulations.

(See e.g., Pls. Br. at 4; 6-8).  These actions, plaintiffs allege, placed them at a competitive

---

[10] Plaintiffs assert that the City has tarried too long in raising its Rule 19 argument.  However, although the City's
explanation for its tardiness is unpersuasive, black-letter law holds that "defense of failure to join a party
indispensable under Rule 19 is preserved throughout the trial."  CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE
AND PROCEDURE, Vol. 7, § 1369 pg. 133 (3d ed. 2001).  Although some courts have held that entry of summary
judgment is specifically inappropriate if based on a failure to join a necessary party because the judgment goes to the
merits of the claim while the defense does not, those courts have nonetheless held that the issue can be raised on
summary judgment and addressed through an order dismissing the claim without reaching the merits.  See, e.g.,
Ricci v. State Bd. of Law Examiners, 569 F.2d 782 (3d Cir. 1978).  Moreover, the cases plaintiffs cite in support of
their argument are inapposite as they deal either with (1) a plaintiff attempting to use Rule 19 offensively, see Gil
Enterprises v. Delvy, 79 F.3d 241, 247-48 (2d Cir. 1996); Judwin Prop. Inc. v. United States Ins. Co., 973 F.2d 432,
434 (5th Cir. 1992), (2) situations where the Rule 19 objection was not even raised before the district court, see
Arnold v. BLaST Interm. Unit 17, 843 F.2d 122, 125 n.6 (3d Cir. 1988) or (3) a motion was brought pursuant to
Rule 12(b)(7), see Fireman's Fund Ins. Co. v. Nat'l Bank of Coop., 103 F.3d 888, 896 (9th Cir. 1996).

[11] This allegation is distinct from the competitively-biased fees claim asserted in TCG.  There, the claim turned on
fees that were imposed on the incumbent monopolist's competitors, but not the incumbent monopolist.  See TCG,
305 F.3d at 77.  Here, plaintiffs allege that the City's laws required Verizon to pay fees for its unlicensed PPTs, but
that Verizon failed to do so with the City's unofficial blessing.  The key distinction thus is, in the first, Verizon is
not accused of wrong-doing, whereas in the second, it assumes the role of co-conspirator, if not ring leader.

disadvantage, and violated the TCA.  Thus, when reduced to the bare essentials, plaintiffs offer a simple story: Verizon broke the law with the City's most necessary connivance.

The difficulty, of course, is the first part of this tale.  Relief on this point for plaintiffs would require the Court to hold that Verizon had in fact been operating "illegal" PPTs and advertising illegally under DoITT regulations, all in Verizon's absence.  Yet, such a declaration could not effectively settle these disputes, for Verizon would not be bound by this declaration (as plaintiffs acknowledge) and could challenge the alleged illegality of its PPTs in another court, thus subjecting the City to inconsistent court-imposed obligations.  On the one hand, the City would be violating the TCA, per this Court's order, by not enforcing the allegedly violated laws and rules against Verizon, while, on the other, Verizon would brandish its own court order shielding it from the City's enforcement.  Consequently, the Court concludes that Verizon is a necessary party to this action.  Cf. Rose v. Simms, 1995 U.S. Dist. LEXIS 17686 (S.D.N.Y. Nov. 27, 1995) (noting that courts often find absent parties to be necessary when they play a significant role in nonmonetary relief).

A determination that Verizon is a necessary party does not mandate dismissal.  Rather, the Court must consider whether Verizon is an indispensable party.[12]  To do so, the Court must "determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable."  Fed. R. Civ. P. 19(b).  Courts are to consider four factors in making this determination: (1) the extent to which a judgment can be entered that is not prejudicial to the absent party or the parties to the litigation, (2) the extent to which this prejudice can be lessened through shaping of the relief, (3)

_____

[12] Neither party discusses the feasibility of joining Verizon and plaintiffs specifically do not make any showing that they would try to join Verizon in lieu of dismissal of their complaint.  But, the Court shall assume, without deciding, that Verizon's joinder would not be feasible, given the enormous practical difficulty of joining Verizon at this late stage in the game after this litigation has been pending for several years.  Cf. Conntech, 102 F.3d at 681 (noting that practical concerns can render joinder not feasible).

the adequacy of the judgment to be entered and (4) if plaintiff will have an adequate remedy if the action is dismissed for joinder.  See id.

Weighing these factors, the answer in this case is clear.  The City belatedly raised Verizon's necessary involvement in a small subsection of plaintiffs' claims as a ground for denying all of plaintiffs' claims, or at least all of their TCA claims.  However, the difficulties attendant on Verizon's absence from this litigation could easily be addressed by simply dismissing plaintiffs' claims relating to Verizon's alleged wrongdoing.  See e.g., Fluent v. Salamanca Indian Lease Auth., 928 F.2d 542, 548 (2d Cir. 1991) (upholding district court's dismissal of counts of a complaint involving an indispensable party).  As a result, the Court dismisses without prejudice plaintiffs' claims under the TCA related to Verizon's alleged wrongdoing.  See generally Direct Energy Marketing Ltd. v. Duke/Louis Dreyfus LLC, 50 Fed. Appx. 469, 473 (2d Cir. 2002) (noting that the proper procedure is to dismiss the claims without prejudice to allow plaintiff to renew its claims in another tribunal).

### (vi)   Extensive Delay, Shifting Rules and Negligence

In their final mash of TCA claims, plaintiffs paint a tale of egregious delay, deliberately shifting regulatory sands and gross administrative negligence.  These factors, plaintiffs argue, created the types of barriers to entry that the TCA was intended to prevent.  The City protests that the delay was attributable to plaintiffs, not DoITT, and does not respond to plaintiffs' remaining allegations.  The Court shall consider each of these allegations in turn.

(a) Delay and Shifting Regulatory Scheme

The second issue Judge Gold left open was the extensive delays that have occurred in the processing of plaintiffs' PPT permits, which he noted "at first blush [was] sufficiently egregious to warrant a judicial response."  November 11, 2002 Report & Recommendation at 17.  What at

first blush concerned Judge Gold is confirmed as impermissible on a second and more sustained look.

Courts have held that extensive delay, coupled with an onerous regulatory scheme, can violate the TCA, particularly when the product of the sort of unfettered discretion enjoyed by DoITT.  See TCG, 305 F.3d at 71 (holding that a seven year delay in issuance of a franchise as a result of mandated negotiations with the municipality violated the TCA); see also City of Auburn v. Qwest Corp., 260 F.3d 1160, 1176 (9th Cir. 2001) (holding that the combination of lengthy application process, burdensome application and unfettered discretion violates the TCA).  Here, plaintiffs allege both a six to eight year delay in processing their PPT applications and a retroactively altered regulatory scheme that frustrated their efforts at entering the market.[13]

Turning first to plaintiffs' allegations of extensive delay, there is no dispute that plaintiffs have had to wait several years for their PPT permit applications to be processed.  The City argues that plaintiffs themselves caused this delay by applying for an "absurd" number of PPT applications and thus overwhelming DoITT's small staff, which was also charged with handling the over 30,000 PPTs already in place.  In addition, the City argues that DoITT was caught unprepared to handle the logistical elements of processing so many PPT permit applications.

Plaintiffs challenge this assertion on several grounds.  First, plaintiffs point to deposition testimony and documents showing DoITT delayed PPT applications in order to solicit input from CBs, even after the deadline set by law.  (See, e.g., Pls. Ex. 58; Allison Oct. 31, 2004 Tr. 309-312).  Plaintiffs note that the back-and-forth with the community boards at times took as much as four years.  (See Allison Oct. 31, 2004 Tr. 311). Second, plaintiffs argue (and provide documentary evidence in support) that the changing legislative tide was rising well before 1996,

---

[13] Of course, it is undisputed that the Commissioner of DoITT retained the type of unchecked discretion addressed in TCG and Qwest.

*i.e.* the future flood of applications to be submitted was foreseeable, and, in any event, DoITT repeatedly reiterated that it was on pace to complete their processing.  (See, e.g. Pls. Exs. 4, 6 & 7).

Plaintiffs also complain about DoITT's application procedure.  To start, they point to the detailed and involved nature of the application itself, which requires, among other things, applicants to identify the type of PPT, whether it would be located in a historic or business improvement district and complete a map of the proposed location of the PPT detailing the cabling required (thus resulting in, according to plaintiffs, an onsite visit for each PPT).  (See Pls. Ex. 9).  Next, plaintiffs allege that DoITT changed the rules mid-game, necessitating re-filings, follow-ups, and additional fees.  (See e.g., Sweeney Decl. ¶ 47; see also Defs. Ex. 23).  Significantly, Allison conceded during his deposition that DoITT had changed the rules throughout this period based on outside pressure and that these changes were unfair.  (See Allison Oct. 31, 2004 Tr. at 306-07).  Among these shifting regulatory sands was DoITT's policy on "triples", that is the installation of multiple PPTs at one location, which was grounds for rejection of applications filed by plaintiffs despite DoITT policy ostensibly allowing such installations.  Finally, it is worth noting that DoITT had a nine step process for approval of a PPT application which included, *inter alia*, soliciting input from CBs and BIDs, and which allowed CBs or BIDs to place long holds on PPT permit applications.  (See Defs. Ex. 31; Pls. Ex. 32).[14]

The case law addressing extensive delay claims does not dwell on the question upon which the parties appear fixated—why there was a delay.  The focus in the cases rests entirely on the anti-competitive effect of the delay and regulations.  See TCG, 35 F.3d at 71; Qwest, 260

---

[14] It should surprise no one that an administrative agency's permit applications and processes are complex and prolix.  Nor is it surprising that a New York City executive agency, even if not required by ordinance, would place a temporary hold on an application while soliciting the views of governmental and quasi-governmental bodies like community boards and BIDs.  The fact such complaints are commonplace does not, of course, excuse a violation of the TCA.

F.3d at 1176.  The Court certainly does not read this omission in decisional law to suggest that no explanation by the administrative agency could ever sufficiently justify the extensive delay claimed here, but, the Court need not delineate the particular boundaries of acceptable justifications to conclude that DoITT's fails to measure up.  The anti-competitive impact of long and involved application procedures that delayed the PPT permit application process for nearly ten years is undeniable.  It is similarly clear that some part of this delay may be attributable to DoITT's becoming overwhelmed or plaintiffs' own actions, much of it was a result of DoITT's self-created decision-making process.  Delay occasioned by such reasons violates the TCA.

(b) Administrative Negligence

Plaintiffs also claim that DoITT has impeded PPT competition through sheer administrative negligence.  Specifically, plaintiffs claim that DoITT (1) rejected their PPT permit applications based on blatantly erroneous siting requirements and (2) simply lost or failed to send to the CBs several hundreds, if not thousands, of plaintiffs' PPT permit applications.  That DoITT site inspections were frequently mishandled or that applications were not sent to CBs or lost is proven by the words of DoITT employees themselves.  (See e.g., Pls. Ex. 15, 17, 18, 37, 38; Greaney Tr. 26, Shor Tr. 134-36; Allison Tr. 95-97, 370).  Similarly indisputable is the conclusion that rejections based on persistently erroneous inspections or lost applications would damage a PPT competitor's business.

All of this, nevertheless, does not guarantee relief.  Initially, plaintiffs have not cited, and the Court has not uncovered, other caselaw or legislative history supporting the proposition that a state or municipality could violate the TCA through sheer negligence, as opposed to deliberate action or inaction.  This is not surprising.  Because every negligent action by an agency official can be said to prejudice the affected competitor's ability to compete (right down to the loss of

40

even one application or the mishandling of a single site inspection); allowing

telecommunications providers to sue municipalities for negligently impacting competition under

the TCA would kick open the doors of the courthouse, requiring federal courts to insert

themselves into the day-to-day operations of local and state agencies.

Albeit in different contexts, the Supreme Court has explicitly cautioned against

intervention by federal courts into operational matters commended to the discretion of state

officials unless a matter of constitutional significance is presented.[15]  See generally Sandin v.

Conner, 515 U.S. 472, 481 (1995) (noting that federal courts should be leery of inserting

themselves into the day-to-day management of prisons without constitutional cause); Bd. of

Educ. v. Pico, 457 U.S. 853, 864 (1982) (stating that federal courts should not intervene in the

workings of local school boards absent allegations of a constitutional violation).  Moreover, the

language of the TCA speaks in terms of rules, regulations and requirements—words suggesting

some deliberate action—not merely unintentional acts or omissions of negligence.  For these

reasons, the Court holds that the TCA does not create municipal liability for mere negligence on

the part of the regulating agency.  Plaintiffs' allegations with respect to DoITT's negligence fail

to state a claim upon which relief can be granted and are, therefore, dismissed.  See e.g., First

Fin. Ins. Co. v. Allstate Interior Demolition Corp. et al., 193 F.3d 109, 115 (2d Cir. 1999).

IV.    First Amendment Retaliation

Turning to plaintiffs' non-TCA based claims, plaintiffs allege that DoITT retaliated

against them for exercising their First Amendment rights in protesting DoITT's alleged

favoritism and improper denials of permits.  DoITT counters that plaintiffs' "retaliation"

---

[15] Even then, the Fourteenth Amendment does not allow for state or municipal liability based purely on negligence. Daniels v. Williams, 474 U.S. 327, 333 (1986).  Just as every malpractice suit is not transformed into an Eighth Amendment claim simply due to the involvement of a prison doctor, see Estelle v. Gamble, 429 U.S. 97, 106 (1976), neither should every case involving a bumbling bureaucrat involved in telecommunications regulation trigger a TCA claim.

argument reflects nothing more than their myopic view of broader DoITT practices innocently implemented around the same time as the exercise of plaintiffs' First Amendment rights; practices that were in no way targeted at plaintiffs and that any evidence plaintiffs present to the contrary is speculative and hearsay.

To begin, there can be no doubt that the right to protest state action due to perceived grievances against the government is bedrock to our democracy and protected under the First and Fourteenth Amendments.  See United Mine Workers v. Illinois State Bar Ass'n, 389 U.S. 217, 222 (1967).  Retaliation based on the exercise of this right is redressable under 42 U.S.C. § 1983. See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 90 (2d Cir. 2002).  To prevail on such a claim, plaintiffs must show that (1) their conduct was protected by the First Amendment and (2) that defendants' action was prompted or substantially caused by the protected conduct.  Id. at 91.  As Judge Dearie has already concluded that plaintiffs' protests to DoITT are protected under the First Amendment, only the second inquiry remains open on this motion.  "The ultimate question of retaliation involves a defendant's motive and intent."  Id.  So, the nub of this portion of the parties' motions turns on the proof offered concerning the motivation behind the complained of DoITT actions.

Plaintiffs, as could be expected, claim a retaliatory motive and ground this claim in the statements allegedly made by high-ranking DoITT employees which targeted plaintiffs.  The stick enforcing these threats, plaintiffs allege, are (1) the increasing number of rejections of PPT permit applications, (2) adoption of the 2004 advertising amendment and (3) increased enforcement activity against plaintiffs.  Although the City is correct that one of the statements relied upon by plaintiffs presents hearsay concerns, plaintiffs have adduced several alleged and admissible party admissions of animus, some of which were made directly to plaintiffs'

employees.  If believed, these statements would certainly demonstrate that DoITT was angered

by plaintiffs' protests and intended to punish plaintiffs by withholding permits, at the very least.

Of course, Cangemi and Shor, two of the DoITT officials accused of making these threats, deny

making them.  Contrary to the City's assertion, however, this type of "he-said, he-said" evidence

does not settle the factual question, but instead renders it genuine and appropriate for trial.  See

Magan v. Lufthansa German Airlines, 339 F.3d 158, 166 (2d Cir. 2003) (inappropriate for a

court on summary judgment to credit one witness's account over another).  Nonetheless,

plaintiffs' First Amendment claim still fails.

    With respect to their permit application denials, plaintiffs' are victims of their own

success.  Even where a plaintiff can demonstrate the elements of a First Amendment retaliation

claim, a defendant can still prevail on summary judgment where it can show that the adverse

action would have been taken regardless of the allegedly improper motive.  See Cotarelo v.

Sleepy Hollow Police Dep't, 460 F.3d 247, 253 (2d Cir. 2006).  Here, plaintiffs have

conclusively established (albeit with little resistance from DoITT) that DoITT already felt that

there were more than enough PPTs installed in the affected community districts to serve public

demand (i.e. district saturation) and was denying PPT permit applications wholesale on that basis

in the time period following plaintiffs filing of their complaint.[16]  Thus, even if DoITT did have

some axe to grind, plaintiffs themselves have established that their PPT permit applications

would have been unsuccessful even sans animus.[17]

---

[16] Plaintiffs argue that district saturation itself is a product of this litigation, relying on the alleged timing of the first
district saturation denials.  However, plaintiffs themselves point out that before they filed their lawsuit, DoITT was
still concerned with limiting the number of PPTs per block—the so-called "blockfront saturation" concern—in 2000.
(See Pls. Ex. 12).  This same concern motivated "district saturation", which merely considered the same question at
a district level.  (See Shor Aff. ¶¶ 110-111).  Just because DoITT chose to address the same concern with a slightly
different analysis and under a different name following the commencement of this action does not render DoITT's
concern or response pretextual.

[17] That district saturation, at least as currently articulated, is improper under the TCA is of no moment to the First
Amendment analysis.

Plaintiffs' claims regarding the 2004 advertising amendment suffers the same fate for the same reason, abetted by the holding in the Article 78 proceeding. The 2004 advertising amendment was the centerpiece of the Article 78 proceeding.  Notwithstanding the disproportionate impact of the 2004 advertising amendment on plaintiffs, the Article 78 court determined that the 2004 advertising amendment was a rational, calculated and deliberate response to a perceived problem of the over-saturation of PPT advertisements across the board. That finding cannot be challenged here.  See generally Jenkins, 478 F.3d at 85.  The City's perceived problem of over-saturation was independent of any alleged grudge DoITT bore against plaintiffs and the response just as inevitable.  That there may have been some litigation benefits to the 2004 advertising amendment, a conclusion plaintiffs reach based on the DeGuia Jr. e-mail, does not sever the non-retaliatory linkage established in the Article 78 proceeding.

As for the allegedly retaliatory enforcement, this claim fails as well. Succinctly, plaintiffs cannot be heard to complain that the City is not entitled to enforce violations against them simply because it may have chosen not to do so in the past and even if the enforcement actions occur after the filing of a lawsuit against the City.  See e.g., Cullen v. Mondello, 117 Fed. Appx. 782, 784 (2d Cir. 2004) ("Plaintiffs' complaint did not immunize them from all subsequent legal actions.").  Rather, Coastal and Telebeam must demonstrate that they were somehow singled out for such enforcement as a result of their protected conduct.  Dispositively, however, defendants have demonstrated that (1) an industry wide enforcement ramp-up was discussed and planned for implementation before the filing of plaintiffs' lawsuit, (2) this ramp-up was conveyed to the PPT industry and (3) more NOVs were issued to plaintiffs' competitors following plaintiffs' filing of their lawsuit as well.  Plaintiffs' suggestion that the proportionality of plaintiffs' increase in NOVs to Verizon's is probative of retaliation rings hollow, for (a) plaintiffs have made no

showing that there was a similar correlation between actual violations of the competitors and (b)

beyond Verizon, the record shows that other competitors also saw their NOVs rise in 2002, some

as much as 70% over 2001.  (See Defs. Ex. 68).  Simply put, plaintiffs have failed to create a

triable issue about somehow being singled out for enforcement actions, much less for retaliatory

reasons.

The plaintiffs' First Amendment retaliation claim is dismissed.

V.    Due Process

Plaintiffs' final "federal" claim asserts an alleged due process violation under the

Fourteenth Amendment, challenging whether the process afforded by 67 RCNY § 6-33, which

sets forth the procedure for revocation of a PPT permit, comports with the Constitution because

it does not offer a hearing before a neutral fact-finder.  The City of course argues that its five-day

letter practice is entirely consonant with the Due Process clause.

RCNY § 6-33(2) sets forth the procedure to be followed where DoITT determines a PPT

needs to be removed.  Initially, the Commissioner, through a writing, informs the PPT permit

holder of the decision to terminate the permit and of the reason for the termination.  The PPT

permit holder may then protest the decision by letter sent to the Commissioner within five days

of the notice (the "five day letter").  Based on review of the five day letter, the Commissioner

will then determine whether or not to proceed with the termination.  If the Commissioner decides

to proceed with the termination, written notice is provided to the PPT permit holder and specifies

a date for removal of the PPT.  If the PPT permit holder does not remove the PPT by that date,

the Commissioner is authorized to remove the phone and recover expenses from the PPT permit

holder.  Plaintiffs allege that this procedure, at least in its application to them, is constitutionally

deficient.  They contend, without contradiction, that they received notice that several of their

PPT permits were to be terminated and that they demanded in writing an evidentiary hearing before a neutral factfinder, *i.e.*, not Shor, who they contend was biased against them. Nevertheless, DoITT revoked their permits and removed the PPTs.

Questions of procedural due process are answered through the weighing of the three factors articulated in <u>Matthews v. Eldridge</u>, 424 U.S. 319, 334-35 (1976): (1) the nature of the private interest allegedly affected by the official conduct, (2) the risk of erroneous deprivations as a result of the procedure used and (3) the government's interest, which includes not only the nature of the function performed, but also the administrative costs and burdens caused by the alternate procedure suggested.  A court must weigh "the risk of an erroneous deprivation of the private interest" if the process afforded were lessened and "the probable value, if any, of additional or substitute safeguards." <u>Jian Hui Shao v. Mukasey</u>, 546 F.3d 138, 167 (2d Cir. 2008) (internal quotations omitted).

All sides, and the Court, agree that plaintiffs have a property interest affected by an application of § 6-33(2).  Where the battle is joined, though, is on the weightiness of that interest. Plaintiffs contend that termination of PPT permits goes to the very heart of their business and merits significant weight.  <u>See</u> <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 543 (1985) (the Supreme Court has "frequently recognized the severity of depriving a person of the means of livelihood").  The City argues that this interest is not so weighty for the decision to remove just one PPT cannot sway plaintiffs' earning potential.  The City's argument misses the mark.  At issue is not the removal of a single PPT, but of the propriety of a process through which the vast majority of plaintiffs' PPTs could be removed, and indeed, through which several were.  Plainly, the significance of the interest advanced by plaintiffs is great.

The parties also clash over the second <u>Eldridge</u> factor.  The City argues that the nature of

the violations addressed by § 6-33(2) requires simple measurements, such as distance of a PPT from a fire hydrant or bus stop, for example, and that, therefore, there is little chance of erroneous deprivation.  Furthermore, the City notes that the availability of Article 78 proceedings to review DoITT's determination puts to bed any alleged concerns over erroneous deprivations. Plaintiffs spin a different story.  They detail incidents where their PPTs were ordered removed by Shor despite plaintiffs alerting him that the "simple" measurements underlying the notices were erroneous, concluding that there is a serious risk of erroneous deprivation because DoITT either cannot take the proper measurements or will not due to some grudge against them and that protests, as a result, should be heard before a neutral fact-finder.

What plaintiffs miss, however, is that the "buck" does not necessarily stop with Shor, or indeed with any DoITT employee.  Rather, plaintiffs can challenge these allegedly erroneous and biased determinations before a neutral judge through an Article 78 proceeding before their PPT is actually removed or their permit revoked.  The fact that their initial fact-finder may be employed by DoITT,with whom plaintiffs share a contentious relationship, is not sufficient to render the process established in rule constitutionally deficient.  See Locurto v. Safir, 264 F.3d 154, 173-74 (2d Cir. 2000).  The Fourteenth Amendment is less demanding, requiring only some review to serve as a meaningful pre-deprivation remedy.  See Krimstock v. Kelly, 464 F.3d 246, 255 (2d Cir. 2006).  Article 78 review is that meaningful remedy and its availability "weighs dispositively in favor of [the City]."  New York State Org. for Women v. Pataki, 261 F.3d 156, 168-69 (2d Cir. 2001).  Accordingly, defendants' motion for partial summary judgment is granted with respect to plaintiffs' procedural due process claim and that claim is dismissed.

VI.    Preclusion Based on the City's Failure to Produce 65 Permits In Discovery

On June 2, 2004, Magistrate Judge Gold ordered defendants to produce permit

application files that were the subject of a discovery imbroglio.  More than six months later, defendants had still failed to produce 65 of these permit files.  As a result, Judge Gold ordered their preclusion.  Plaintiffs now request that their motion for partial summary judgment be granted with respect to those 65 permits.  Defendants counter that liability still cannot be summarily established because they are entitled to present other evidence regarding the 65 permits.  Moreover, defendants claims that because 15 of the permit applications were filed before the effective date of the rule authorizing the filing of applications (thus rendering them null and void according to defendants) and another 15 were returned to plaintiffs, plaintiffs are not entitled to any inference with respect to this batch of 30.

This *post hoc* rationalizing comes up short.  The question is not why DoITT could have rejected these 65 permit applications, but rather why they were rejected.  If they were rejected based on anti-competitive reasons, this would run afoul of the TCA.  The evidence defendants have marshaled on summary judgment with respect to these permits is scant and, more importantly, sheds no light on the dispositive question.  Without doubt, the best evidence of regularity in DoITT's decisionmaking are the very files Judge Gold has properly precluded defendants from offering.  Thus, defendants should be, and are, precluded from producing any evidence with respect to these 65 permits.  See Reilly v. Natwest Mkts. Group Inc., 181 F.3d 253, 268 (2d Cir. 1999).  As plaintiffs have produced sufficient evidence to show that the City did utilize considerations barred by the TCA and because the City cannot rebut that those considerations were used with respect to these permits, summary judgment for plaintiffs on their TCA claims specifically relating to these 65 permits is appropriate.  See e.g., Thomas E. Hoar, Inc. v. Sara Lee Corp., 1998 U.S. App. LEXIS 23532 (2d Cir. Sept. 14, 1998).  As for any First Amendment claims relating to these permits, the Court has already concluded that these fail for

other reasons and are thus dismissed.  See pg. 46-47, supra.

    VII.    <u>Article 78</u>

    Defendants seek dismissal of plaintiffs' claims brought pursuant to Article 78 for lack of jurisdiction or, alternatively, urge that the Court decline to exercise its supplemental jurisdiction over them.  Because plaintiffs' Article 78 claims are based on state law, in the absence of diversity, they may be brought in this Court permissively only through the exercise of supplemental jurisdiction.  28 U.S.C. § 1367(a).  Yet, despite the breadth of the language authorizing supplemental jurisdiction, "[i]t is doubtful . . . that claims under Article 78 are even amenable to a federal district court's supplemental jurisdiction."  <u>Morningside Supermarket Corp. v. N.Y. State Dep't of Health</u>, 432 F. Supp. 2d 334, 346 (S.D.N.Y. 2006).  The overwhelming majority of district courts confronted with the question of whether to exercise supplemental jurisdiction over Article 78 claims have found that they are without power to do so or have declined to do so.  See <u>id.</u> at 346-48 (denying supplemental jurisdiction and declining to "deviat[e] from the well-reasoned and essentially unanimous position of New York district courts on . . . [this] issue."); see also <u>Blatch ex. Rel. Clay v. Hernandez</u>, 360 F. Supp. 2d 595, 637 (S.D.N.Y. 2005) (dismissing an Article 78 claim for lack of subject matter jurisdiction, "as New York State has not empowered the federal courts to consider such claims.").

    Only two cases have been advanced where a federal court has exercised jurisdiction over an Article 78 claim.  In <u>Yonkers Racing Corp. v. City of Yonkers</u>, the Second Circuit affirmed the district court's exercise of jurisdiction pursuant to the All Writs Act, 28 U.S.C. §1651 (a), as jurisdiction was "necessary to protect the integrity of the Consent Decree [previously issued by the district court] and because the issues raised by the Article 78 petitions cannot be separated from the relief provided by the Consent Decree."  <u>Yonkers Racing Corp. v. City of Yonkers</u>, 858

F.2d 855, 865 (2d Cir. 1988).  In the second case, <u>Cartagena v. City of New York</u>, 345 F. Supp.

2d 414, 426 (S.D.N.Y. 2004) a case heavily relied upon by the defendants, the district court,

acknowledging the unusual circumstances of the case, accepted supplemental jurisdiction only

after the defendants withdrew their jurisdictional objections.  Again, both the <u>Yonkers Racing</u>

<u>Corp.</u> and <u>Cartagena</u> courts refer to the extraordinary circumstances which led to their deviation

from the ordinary treatment accorded Article 78 claims in this circuit.  <u>See</u> <u>Yonkers Racing</u>

<u>Corp.</u>, 858 F.2d at 864 ("exceptional case"); <u>Cartagena</u>, 345 F. Supp. 2d at 426 ("unusual

circumstances of this case").

In any event, where supplemental jurisdiction is claimed, district courts still may decline

to exercise it pursuant to 28 U.S.C. § 1367 (c).  <u>See</u> 28 U.S.C. § 1367 (c) ("The district courts

may decline to exercise supplemental jurisdiction over a claim . . . if (1) the claim raises a novel

or complex issue of State law, (2) the claim substantially predominates over the claim or claims

over which the district court has original jurisdiction, (3) the district court has dismissed all

claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other

compelling reasons for declining jurisdiction.").

"The very nature of an Article 78 proceeding presents such compelling reasons" for

declining supplemental jurisdiction pursuant to 28 U.S.C. § 1367 (c)(4).  <u>See</u> <u>Morningside</u>

<u>Supermarket Corp.</u>, 432 F. Supp. 2d at 346; <u>see</u> <u>also</u> <u>Brevot v. N.Y. City Dep't of Educ.</u>, 2007

U.S. Dist. LEXIS 16109 (S.D.N.Y. Mar. 5, 2007).  "An Article 78 proceeding is a novel and

special creation of state law, and differs markedly from the typical civil action brought in

[federal district court] in a number of ways."  <u>Lucchese v. Carboni</u>, 22 F. Supp. 2d 256, 258

(S.D.N.Y. 1998).  As a "purely state procedural remedy," <u>Camacho v. Brandon</u>, 56 F. Supp. 2d

370, 380 (S.D.N.Y. 1999), an Article 78 proceeding is "designed to accommodate to the state

court system." Herrmann v. Brooklyn Law Sch., 432 F. Supp. 236, 240 (E.D.N.Y. 1976).

Because exercising supplemental jurisdiction over such claims requires a federal court to "usurp

the statutory authority bestowed upon the New York state courts," Adler v. Pataki, 204 F. Supp.

2d 384, 396 (N.D.N.Y. 2002) (citation and internal quotation marks omitted), "federal courts are

loath to exercise jurisdiction over Article 78 claims." Birmingham v. Ogden, 70 F. Supp. 2d

353, 372 (S.D.N.Y. 1999); see also Morningside Supermarket Corp., 432 F. Supp 2d at 347

("Federal courts in New York agree that 'Article 78 proceedings were designed for the state

courts, and are best suited to adjudication there.'") (internal quotation omitted); Bd. of Managers

of Soho Int'l Arts Condo. v. City of New York, 2004 U.S. Dist. LEXIS 17807 (S.D.N.Y. Sept.,

8, 2004) ("The Article 78 proceeding is a unique state procedural law best left to the expertise of

the state courts, the very places where the state legislature intended such action to be tried.");

Camacho, 56 F.Supp.2d at 380 ("[W]e see no reason to exercise [the court's] discretion [to

exercise supplemental jurisdiction] by adjudicating a purely state procedural [and substantive]

remedy."); Herrmann, 432 F.Supp. at 240 ("This special proceeding designed to accommodate to

the state court system is best suited to that system."); Beckwith v. Erie County Water Auth., 413

F. Supp. 2d 214, 227 (W.D.N.Y. 2005) ("As state law does not permit Article 78 proceedings to

be brought in federal court, absent an unusual circumstance warranting, pursuant to Yonkers

Racing Corp... invoking the All Writs Act, this court lacks supplemental jurisdiction over

Beckwith's Article 78 claim.").

  To be sure, federal courts have, with rare exception, denied supplemental jurisdiction to

Article 78 claims. Case law has catalogued a myriad of good reasons, especially when, as here,

the claims are brought to obtain judicial review of the actions of a state or local administrative

agency. Comity suggests such review be afforded by the state apparatus by which the agency is

created and authorized to act.  For all of these reasons, the Court declines to exercise

supplemental jurisdiction over plaintiffs' Article 78 claims.  Accordingly, plaintiffs' Article 78

claims (numbered 9-16) are hereby dismissed without prejudice and leave is granted to re-plead

them in state court no later than 90 days following the entry of final judgment in this action,

provided that any claim re-pled was timely brought when first pled in this action.[18]

### Conclusion

For the reasons set forth above, plaintiffs' motion for partial summary judgment is

granted, to the extent that plaintiffs are entitled to a declaration that the City of New York

violated the TCA (a) through the exercise of the unfettered discretion of the Commissioner of its

Department of Information Technology and Telecommunications to approve or deny PPT

permits, including the Commissioner's consideration of "district saturation" and any and all

other factors relating to consumer demand, and (b) through the extensive delays in the PPT

permitting process systemically and, specifically, with respect to the 65 PPT permit applications

subject to Magistrate Judge Gold's preclusion order.  Since Coastal and Telebeam have

established the City's liability under the TCA, appropriate injunctive and declaratory relief must

be crafted in further proceedings.  The parties are directed to schedule a hearing to continue with

this portion of the case.  The balance of plaintiffs' motion is denied.

The cross motion of the defendants is also granted, to the extent plaintiffs' claims with

respect to any alleged wrongdoing on the part of Verizon, and the Article 78 claims plaintiff

sought to assert pursuant to the Court's supplemental jurisdiction, are dismissed without

prejudice.  The following causes and claims pled by plaintiffs are also dismissed but with

prejudice:  plaintiffs' TCA claims with respect to DoITT's alleged negligence and DoITT's 2004

---

[18] It should be observed that in practical terms the Article 78 proceeding will be likely rendered moot by other relief to be accorded plaintiffs in this action for the City's violation of the TCA.

advertising regulations, plaintiffs' First Amendment claims and their procedural due process claim.  All claims for damages resulting from the City's violation of the TCA under all theories alleged are also dismissed, as are each and every claim pled against DoITT as an entity separate and distinct from the City of New York.

SO ORDERED.


Dated: Brooklyn, New York
September 30, 2009

s/ENV_____

ERIC N. VITALIANO
United States District Judge